UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
____

UNITED STATES OF AMERICA,

        Plaintiff,

Case No. 1:14-cv-1205

v.

Honorable Paul L. Maloney

TAMMY M. CHURCH, et al.,

        Defendants.

_____/

**REPORT AND RECOMMENDATION**

    The United States brought this action seeking to reduce to judgment unpaid tax liabilities owed by Tammy Church and her company, R&R Utilities, LLC, and to enforce its liens on Ms. Church's home.  Ms. Church retained the services of Attorney Thomas J. Gezon to represent her and her company in this case.  After reaching a settlement, the parties moved this Court on April 1, 2016, to approve an Agreed Final Judgment.  (ECF No. 50).  The Court entered the Agreed Final Judgment on April 8, 2016.  (ECF No. 51).

    Eleven months later, on March 9, 2017, Ms. Church sought to terminate Mr. Gezon as her counsel.  (ECF No. 52).  On the same day, she filed a motion to set aside the Agreed Final Judgment (ECF No. 53), which is being treated as a motion under Federal Rule of Civil Procedure 60(b)(1).  Pursuant to that rule, Ms. Church is entitled to relief only if she establishes that the judgment resulted from "mistake, inadvertence, surprise, or excusable neglect."  In her Rule 60(b)(1) motion, Ms.

Church raised with the Court for the first time her contention that she had not consented to the settlement. She offered no explanation in the motion for the significant delay in bringing it.

This matter has been referred to me to conduct an evidentiary hearing on the disputed factual issue of whether Mr. Gezon had Ms. Church's authority to settle this case and to agree to the entry of final judgment. (Oct. 19, 2018, Order of Reference, ECF No. 75). I have been directed to file a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) regarding my findings. (*Id.*). I conducted an evidentiary hearing on November 27, 2018, at which Ms. Church and Mr. Gezon testified. (Minutes, ECF No. 82). I have also considered pre-hearing declarations and exhibits filed by Ms. Church and Mr. Gezon.

## Legal Standard and Burden of Proof

An attorney may not agree to a final resolution of his client's case without express authority from the client. *Bradford Exchange v. Trein's Exchange*, 600 F.2d 99, 102 (7th Cir. 1979) (citing *Associates Discount Corp. v. Goldman*, 524 F.2d 1051 (3d Cir. 1975); *Thomas v. Colorado Trust Deed Funds, Inc.*, 366 F.2d 136 (10th Cir. 1966)). An attorney is presumed to act with such authority, however, and that presumption may be overcome only by "affirmative proof that the attorney had no right to consent." *Bradford Exchange*, 600 F.2d at 102 (citing *United States v. Beebe*, 180 U.S. 343 (1901)). Ms. Church, then, bears the burden of proving that Mr. Gezon did not have her authorization to settle this case and to consent to the entry of judgment.

2

## Factual Findings

I make the following relevant factual findings by preponderant evidence:

Mr. Gezon came to represent Ms. Church through his volunteer work with West Michigan Legal Aid Group (Legal Aid). Ms. Church contacted Legal Aid seeking representation in this case, and Legal Aid referred her to Mr. Gezon. Mr. Gezon discussed the case with Ms. Church, including her interest in resolving her tax liability and getting some money to move on with her life. Mr. Gezon then prepared a retainer agreement reflecting the goals they had discussed. (Gezon, Hrg Tr. at 47-51, ECF No. 83, PageID.518-22; *see* Retainer Agreement, ECF No. 61-1).

Ms. Church reviewed and signed the retainer agreement on February 27, 2015. (Church Decl., ¶ 2, ECF No. 61, PageID.315; Church, Hrg Tr. at 16, 28, PageID.487, 499). She acknowledges that she hired Mr. Gezon to help her negotiate a settlement with the government and Old Republic National Title Insurance Company (Old Republic).[1] (Church, Hrg Tr. at 18, PageID.489). By signing the agreement, Ms. Church agreed that the goals of a negotiated resolution would include the following:

- an agreement to allow time for [Ms. Church] to list and sell [her] home, with the net proceeds going to the IRS;
- to excuse or reduce [Ms. Church's] remaining obligation to the IRS, based on the sale; [and]
- to ask for permission to stay in the home while it is listed and to receive an amount of the net proceeds to assist [Ms. Church] in relocating after the sale.

(Retainer Agreement, ¶ 1, PageID.324).

---

[1] Old Republic holds a mortgage lien on Ms. Church's home, and its lien stands second to the IRS's lien. (*See, e.g.,* Agreed Final Judgment, ¶ 10, ECF No. 51, PageID.195).

Also by signing the retainer agreement, Ms. Church conceded her tax liability and the fact that there was "little to no likelihood" of defeating the IRS tax lien. She also acknowledged that the interests of creditors would have to be satisfied before she could retain her home. (*Id.*).

Mr. Gezon began his investigation of the tax liabilities at issue in this case through discussions with government counsel. Mr. Gezon obtained and reviewed tax transcripts for the relevant years; he asked a retired IRS agent to review the tax transcripts; and he consulted a retired Assistant U.S. Attorney (AUSA) who had significant experience in tax cases. The retired agent advised Mr. Gezon that there were no viable defenses or challenges to the tax computations in the government's complaint. The former AUSA confirmed that there was no viable defense to the IRS's tax claim. Mr. Gezon discussed with Ms. Church the results of his investigation. (Gezon Decl., ¶ 5, ECF No. 58-1, PageID.278; Gezon, Hrg Tr. at 51-53, PageID.522-24).

The tax liabilities resulted from a combination of Ms. Church's failure to forward to the IRS the tax withholdings from her employees' wages, as well as her failure to timely file 1040 tax returns and pay the taxes due.[2] (Gezon Decl., ¶ 3, PageID.277). The total tax debt amounts to approximately $900,000. (*Id.* at ¶ 6, PageID.278).

---

[2] Ms. Church's husband was involved in the business and is also responsible for the tax liability. Ms. Church is now divorced from her husband, and she is the sole owner of the house in question. (*See* Oct. 19, 2015, Confidential Settlement Letter, ECF No. 58-5, PageID.293-94).

4

Based upon his review of the tax liabilities in this case, Mr. Gezon discussed settlement options with Ms. Church.  Ms. Church expressed a preference for a settlement that would allow her to stay in her home as long as possible, and to limit her tax liability to the sales price of her home; both of these would be contingent upon her willingness to cooperate in selling her home.  (Gezon Decl., ¶ 6, PageID.278).

Mr. Gezon discussed a settlement agreement in principle with the government along the lines Ms. Church had indicated.  In a letter to government counsel, dated June 11, 2015, Mr. Gezon documented those terms, which included the following:

- Ms. Church would agree to list and sell her home on the open market "for the highest and best offer," utilizing a licensed broker who would receive the prevailing brokerage fee, with the government having a right to review and approve any purchase offer;

- The IRS would receive the net proceeds from the sale of Ms. Church's home to satisfy her tax liability, including penalties and interest;

- The IRS would agree to forgive the balance of Ms. Church's tax liability, including penalties and interest, and to dismiss its complaint;

- The IRS would agree to pay Mr. Gezon's fees up to $5,000 out of the proceeds from the sale of Ms. Church's home; and

- Ms. Church would receive a small moving expense allowance in exchange for maintaining the house during the sale process.

(ECF No. 58-4, PageID.289-90).

Mr. Gezon sent a copy of this letter to Ms. Church (*id.* at PageID.290), and Ms. Church has acknowledged receiving it (Church, Hrg Tr. at 29-30, PageID.500-01). Ms. Church never contacted Mr. Gezon to object to that letter, nor did she advise him that he did not have her authorization to negotiate a resolution consistent with those terms.  (Gezon, Hrg Tr. at 55, PageID.526).  Instead, on June 11, 2015, she obtained

5

– at Mr. Gezon's request – a written estimate from a moving company of the cost of moving her out of her home. (Church Decl., ¶ 8, PageID.317; *see* June 11, 2016, Letter from Two Men and a Truck, ECF No. 61-1, PageID.362).

Old Republic, who held a mortgage on Ms. Church's home, objected to the proposed settlement. (Gezon Decl., ¶ 5, PageID.278). This resulted in a settlement conference before me on October 22, 2015. Mr. Gezon discussed with Ms. Church the approach he intended to take at the settlement conference, and Ms. Church agreed. (*Id.* at ¶ 9). Mr. Gezon sent a confidential settlement letter to the Court in preparation for the settlement conference, a copy of which he reviewed with Ms. Church. (*Id.* at ¶ 9, PageID.278-79; Gezon, Hrg Tr. at 55-57, PageID.526-28). That letter recounted the background of the tax liability, the calculations relating to the tax liability, the terms of the settlement agreement reached in principle with the government, and it advised that all parties had approved the agreement with the exception of Old Republic. (Oct. 19, 2015, Confidential Settlement Letter, ECF No. 58-5). The confidential letter noted that "Ms. Church has approved the tentative settlement to which Old Republic objects." (*Id.*, PageID.295).

No settlement agreement was reached during the settlement conference. (*See* Minutes, ECF No. 47). Ms. Church acknowledges her attendance at the settlement conference, but she now claims that she told Mr. Gezon that she was unwilling to settle this case before the "investigation and discovery was complete." (Church Decl., ¶ 3, PageID.315). Discovery closed on March 1, 2016. (Case Management Order, ECF No. 48, PageID.177).

Old Republic eventually relented in its objection to the settlement outlined above, which allowed Ms. Church and the IRS to proceed with the settlement agreement. (Gezon Decl., ¶ 10, PageID.279). Several drafts of what became known as the Agreed Final Judgment were thereafter circulated among the parties. Mr. Gezon "shared those drafts with [Ms. Church]," and he "explained the fineries of what [the parties] were doing." (Gezon, Hrg Tr. at 58-59, PageID.529-30; *see* March 16, 2016, email, ECF No. 58-6, PageID.300; March 29, 2016, email, ECF No. 58-6, PageID.301; April 1, 2016, email, ECF No. 58-6, PageID.297). Ms. Church had a number of discussions with Mr. Gezon during this process. She expressed her "hop[e] that the government would relent and give her more money in the settlement process," but she never questioned nor said anything to Mr. Gezon to suggest she was having second thoughts about the settlement agreement. (Gezon, Hrg Tr. at 59-60, PageID.530-31).

To the contrary, Ms. Church agreed to the "final settlement draft" (Gezon Decl., ¶ 11, PageID.279), and she gave Mr. Gezon the authority to sign the Agreed Final Judgment and the joint motion for its acceptance. (Gezon, Hrg Tr. at 60, PageID.531). On March 29, 2016, Mr. Gezon sent an email to Ms. Church in which he stated: "Ms. Church: Following our review and discussion of the Government's stipulation and motion, this is to confirm your agreement with it and your authorization for me to sign off on it. Thanks." (ECF No. 58-6, PageID.301). On April 1, 2016, at 10:38 a.m., Mr. Gezon sent Ms. Church by email a revised version of the agreement, noting that a "clarification" had been made that "[did not] change the basic agreement," and

7

advising her that "all the other parties and we have agreed to submit this version to the judge." (ECF No. 58-6, PageID.297). Later that same day,[3] government counsel filed the joint motion to approve the Agreed Final Judgment. (ECF No. 50). The Agreed Final Judgment was attached. (ECF No. 50-1).

The terms of the Agreed Final Judgment are generally consistent with the substantive terms Mr. Gezon negotiated with the government, which were included in his letter of June 11, 2015. The final agreement reduces to $3,000 (from $5,000) the limit on fees Mr. Gezon could recover; it specifies that Ms. Church will receive a fee of up to $2,500 for maintaining her residence during the sales process; and it provides that Old Republic stands fourth in line, after the IRS, in receiving proceeds from the sale of Ms. Church's home.[4] (*Compare* June 11, 2015, letter, ECF No. 58-4, PageID.289-90, *with* Agreed Final Judgment, ECF No. 50-1, PageID.187-88). On April 8, 2016, Mr. Gezon sent Ms. Church an email forwarding a copy of the Agreed Final Judgment that was entered by the Court, and noting that "the next step" was for her to sign the listing agreement. (ECF No. 58-6, PageID.302).

Ten days later, on April 18, 2016, Ms. Church signed a listing agreement with a realtor for the sale of her home (*see* ECF No. 58-7), pursuant to the terms of the settlement agreement as reflected in the Agreed Final Judgment. The sales price

---

[3] The Court's electronic case filing system shows that the filing was made at 3:54 p.m.

[4] On October 30, 2018, Ms. Church entered into a separate settlement agreement with Old Republic, which is reflected in a proposed consent order filed with the Court on November 19, 2018. (*See* ECF No. 80). This proposed consent order would be rendered moot should the Court deny Ms. Church's motion to set aside the Agreed Final Order.

8

was listed at $575,000. (*Id.* at PageID.305). Ms. Church testified that the only reason she signed the listing agreement was that she felt compelled by the Agreed Final Judgment of April 8. (Church, Hrg Tr. at 37-38, PageID.508-09). The house had not sold as of the date of the evidentiary hearing; in fact, there had been no offers. It is listed with another realtor with an asking price of $520,000. (Church, Hrg Tr. at 39-40, PageID.510-11).

Ms. Church acknowledges receipt of Mr. Gezon's various communications regarding the negotiation and filing of the Agreed Final Judgment, and she concedes that he discussed with her the potential settlement agreement that included the sale of her home.[5] She also admits that she received and reviewed two to three versions of the proposed settlement agreement, including the Final Agreed Judgment. She claims, however, that she contacted Mr. Gezon by telephone each time she received a settlement proposal and advised him that she did not agree to it.[6] (Church, Hrg Tr. at 20-25, 34, PageID.491-96, 505). She also claims that she told Mr. Gezon that she "did not want to settle, that . . . [she] wanted to find more information on [her] case

---

[5] Ms. Church now takes issue with the settlement provision allowing payment of fees to Mr. Gezon due to the fact that he was retained on a "*pro bono*" basis. (Church, Hrg Tr. at 13-17, ECF No. 83, PageID.484-88). The retainer agreement specifically anticipated this provision, however. (*See* Retainer Agreement, ¶ 2, ECF No. 61-1, PageID.325). Moreover, this issue is not relevant to whether Ms. Church consented to the final settlement agreement.

[6] Ms. Church specifically acknowledges receipt of the March 29, 2016, email in which Mr. Gezon confirmed her agreement with the final settlement and the filing of the Agreed Final Judgment (*see* ECF No. 58-6, PageID.301), and she admits that she did not respond to that email, claiming instead that she chose to contact Mr. Gezon by telephone to advise him that she did not agree to the terms of the final settlement. (Church Decl., ¶ 4, PageID.316-19).

9

before [she] settled with anybody." (*Id.* at 24, PageID.495). Ms. Church testified that her communications with Mr. Gezon about her lack of agreement with the settlement proposals were limited to telephone conversations, and she conceded that she had no records regarding those telephone calls. (*Id.* at 25, PageID.496).

When asked why Mr. Gezon would continue to circulate drafts of a settlement agreement if she had instructed him not to pursue the agreement, Ms. Church responded: "I don't know." (*Id.* at 21-22, PageID.492-93). When asked whether she ever directed Mr. Gezon to stop sending draft agreements, Ms. Church hedged in her responses (*see id.* at 22-24, PageID.493-95), eventually stating that "[she] never told [Mr. Gezon] to stop e-mailing [her]. . . . [or] to stop contacting [her]." (*Id.* at 24, PageID.495). She ultimately conceded that she never instructed Mr. Gezon to stop negotiating a settlement agreement along the lines that are reflected in the draft agreements. (*Id.* at 31, PageID.502).

The record reflects that, in October 2016, Ms. Church had a change of heart about the terms of the settlement agreement. She sent a lengthy email to Mr. Gezon on October 19, 2016, in which she indicated that she had received tax advice from an unidentified company; she complained about the terms of the Agreed Final Order; she expressed interest in appealing the order and in renegotiating a settlement "under special circumstances"; and she discussed her deteriorating health and finances. (*See* Hrg Tr. at 65-67, PageID.536-38 (reciting contents of email)).

As Ms. Church characterized the email during the evidentiary hearing: "I was trying to notify Mr. Gezon . . . that I was not happy with [the Agreed Final Judgment],

and that [Mr. Gezon was] still my attorney . . . ." (Church, Hrg Tr. at 67, PageID.538). Notably, nowhere in this lengthy email – sent a full six months after the entry of the Agreed Final Judgment – does Ms. Church so much as suggest that she had not authorized the final settlement; she simply complains about its terms.

On October 25, 2016, Ms. Church sent Mr. Gezon an email forwarding to him a copy of a letter she intended to send to government counsel, asking Mr. Gezon to review and correct as needed. (*See* Hrg Tr. at 64-65, PageID.535-36 (reciting contents of email); Oct. 25, 2016, email, ECF No. 61-1, PageID.406).[7] In the attached letter addressed to government counsel, Ms. Church stated that she wanted "to abandon" the Agreed Final Judgment due to a number of reasons, including her health conditions, her financial hardship, and her use of narcotic pain medication. (*See* Church Letter, dated Oct. 25, 2016, ECF No. 61-1, PageID.407). But nowhere in this letter does Ms. Church indicate her lack of consent to the settlement agreement.

## Discussion

This case proves the proverb: "no good deed goes unpunished." Ms. Church hired Mr. Gezon, *pro bono*, to help her negotiate a reasonable resolution to a $900,000 tax debt she owed the IRS, and a $300,000 mortgage debt she owed Old Republic, both of which held liens on her $500,000 home. Mr. Gezon did as she asked, and now Ms. Church, having had buyer's remorse, seeks to withdraw from her settlement

---

[7] Ms. Church had already contacted government counsel by email on October 19, 2016, without copying her attorney, Mr. Gezon. (*See* ECF No. 61-1, PageID.405). Government counsel appropriately replied by reminding Ms. Church that any communication be made through counsel, and he copied Mr. Gezon on this response. (*See id.*).

11

agreement by accusing Mr. Gezon of acting without her authority and against her wishes.

Ms. Church's contention that she never agreed to the settlement of this case according to the terms of the Agreed Final Judgment is supported only by her June 30, 2017, declaration and her testimony during the November 27, 2018, evidentiary hearing. She has offered no documentation of any communication indicating her lack of consent that predates the entry of the final judgment. And this lack of documentation stands in stark contrast to all the evidence indicating that she was kept informed of the settlement negotiations, and that she approved the terms of the Agreed Final Judgment.

First and foremost, she signed a retainer agreement that set out the three goals of a negotiated settlement she hired Mr. Gezon to achieve: (1) an agreement that allowed Ms. Church to sell her home, with the net proceeds going to the IRS; (2) the forgiveness of any IRS debt that exceeded the net proceeds from the sale of her home; and (3) the ability to remain in her home pending its sale, with a stipend to help cover her moving expenses. (*See* Retainer Agreement, ¶ 1, PageID.324). All three of these goals have been achieved through the settlement Mr. Gezon negotiated. (*See* Agreed Final Judgment, ¶¶ 7-11, PageID.194-95). Mr. Gezon accomplished what Ms. Church hired him to do. It is certainly possible, of course, for a client to have a change of heart, but one would expect that such a significant change of heart would be reflected in some written communication, just as Mr. Gezon's original instructions were set out in the written retainer agreement.

Moreover, Ms. Church acknowledged by signing the retainer agreement that she had "little to no likelihood" of defeating the IRS tax lien, and that the interests of the creditors, which includes Old Republic, would also have to be satisfied before she could keep her home. (*See* Retainer Agreement, ¶ 1, PageID.324). By any account, Ms. Church's tax debt to the IRS well exceeded the value of her home, not to mention the Old Republic mortgage. She had – and has – no reasonable prospect of keeping her home, and she has offered no rational basis for deviating from the original plan to which she agreed.

It is evident from the record that Ms. Church was more than capable of sending letters and emails when she believed it necessary to protect her interests. For example, she corresponded directly with counsel for the government (despite the fact that she was still represented by Mr. Gezon) seeking to renegotiate the settlement agreement. She also sent emails to Mr. Gezon when she wanted his input on her letter to government counsel, and when she advised Mr. Gezon that she was terminating his services. But, when Mr. Gezon sent her a copy of his June 2015 letter outlining the settlement proposals to the government, she put nothing in writing to advise Mr. Gezon he was on the wrong track. Ms. Church also failed to submit to Mr. Gezon any kind of written objection to the Agreed Final Judgment after he sent it to her on March 29, 2016, attached to an email confirming her oral agreement and authorization for Mr. Gezon to sign off on it. The absence of any documentation indicating a lack of consent to the Agreed Final Judgment – despite being kept in the

loop on the progress of the negotiations and being provided copies of the settlement documents – speaks volumes.

It is also evident from the record that it was Ms. Church's post-settlement remorse, not her lack of consent, that led her to seek to set aside the Agreed Final Judgment. To the extent there is documentation of Ms. Church's dissatisfaction with the settlement of this case prior to her filing the motion to set aside the judgment, it addresses her complaints about the *terms* of the agreement and her interest in *renegotiating* those terms, not her current claim that she never consented to the agreement.

Ms. Church conceded that she waited ten months before making her first attempt to contact the Court to contest the Agreed Final Judgment. (Church, Hrg Tr. at 41, PageID.512). She testified that the delay was due to her efforts to consult with various other attorneys. (*Id.* at 41-43, PageID.512-14). But this does not account for the fact that she considered Mr. Gezon to be her attorney until February 10, 2017, when she sent him an email severing their relationship. (*See* ECF No. 61-1, PageID.410 ("I, Tammy Church, would like to seek different counsel as of today, 2/10/17.")). Yet she offers no evidence that she ever asked Mr. Gezon to contest the Agreed Final Judgment, even though she had known of its filing for some ten months, and even though she felt compelled by the judgment to sign a listing agreement to sell the very house she says she wants to keep.

I find that Ms. Church's testimony regarding her lack of consent to the settlement and the filing of the Agreed Final Judgment lacks credibility. Moreover, it is simply implausible.

### Recommended Disposition

In sum, having considered the evidence proffered during the November 27, 2018, hearing, as well as the record evidence, and having had the benefit of assessing the witnesses' credibility, I find that Ms. Church has failed to meet her burden of proving that Mr. Gezon did not have her authority to sign the agreed final judgment. Ms. Church has, therefore, failed to establish entitlement to relief under Rule 60(b)(1). Accordingly, I am recommending that the Court deny Ms. Church's motion to set aside final judgment (ECF No. 53).

Dated: April 2, 2019  /s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge

### NOTICE TO PARTIES

ANY OBJECTIONS to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).